**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Liberty Corporate Capital Limited, | No. CV-19-05698-PHX-GMS |
|       Plaintiff/Counterdefendant, | **ORDER** |
| v. | |
| Jill Marie Steigleman, | |
|       Defendant/Counterclaimant. | |

Pending before the Court are Plaintiff/Counterdefendant Liberty Corporate Capital ("Plaintiff" or "Liberty") Limited's Motion for Summary Judgment (Doc. 112), Motion to Exceed Page Limitation for Reply in Support of Motion for Summary Judgment (Doc. 148), Motions to Seal (Docs. 118, 119, 120, 129, 132, 137, 149), Motion to Exclude Mary Fuller (Doc. 117), and Motion in Limine to Exclude Expert Opinions of Defendant's Treating Providers (Doc. 115) and Motion in Limine to Exclude Expert Opinions of Dr. John R. Ehteshami (Doc. 116). Also pending are Defendant/Counterclaimant Jill Marie Steigleman's ("Defendant") Motion to Exclude Expert John R. Klein, M.D. (Doc. 114) and Motion in Limine to Exclude Plaintiff Liberty's Expert Witness Benedict O'Neill (Doc. 126) and Motion to Strike the Declarations of Mr. Scott Lalonde and Mr. Michael Evans Filed in Support of Liberty's Motion for Summary Judgment (Doc. 142) and Motion to Strike Liberty's New Exhibits and Portions of Its Reply in Support of Summary Judgment (Doc. 153).

1   Plaintiff's Motions to Seal are denied.[1]  For the reasons below, Plaintiff's Motion

2   for Leave (Doc. 148) is granted.  Defendant's Motion to Strike (Doc. 153) is denied.[2]

3   Plaintiff's Motion for Summary Judgment is denied. (Doc. 112).  The parties' Motions in

4   Limine and Motions to Exclude are granted in part and denied in part as explained below.

5                                           **BACKGROUND**

6           This lawsuit arises out of an excess disability policy that was offered to Defendant

7   due to her employ as an insurance agent.  Defendant owned an insurance agency that sold

8   insurance products offered by Farm Bureau Insurance Company ("Farm Bureau").

9   Through this work, Defendant was a voluntary member of a professional organization

10  called "The Agent's Association" (hereinafter, "TAA").  In 2014, an insurance broker

11  offered TAA's members an excess disability income insurance policy through Lloyd's of

12  London ("Lloyd's").  Plaintiff served as one of several Underwriters at Lloyd's that

13  subscribed to Defendant's Individual Insurance Certificate, No. RCA43714038-044

14  ("Certificate").  Members were "guaranteed acceptance" if they had an existing standard

---

[1] Liberty seeks to file its Motion for Summary Judgment, Accompanying and Corrected Statement of Facts, Reply in Support of its Motion, as well as its Motions to Exclude Expert Opinions and its Responses to Defendant's Motions to Exclude under seal.  They have so moved to preserve the Defendant's privileged and confidential medical information." (Doc. 118–20, 129, 132, 137, 149).  As Plaintiff correctly notes, however, the public has a general right to inspect judicial records and documents such that a party seeking to seal a judicial record must overcome "a strong presumption in favor of [public] access." *Kamakana v. City and Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006).  In this case, Defendant has herself filed motions, responses and replies addressing all of her private information in Plaintiff's motion.  She has not filed any of those materials under seal.  At the same time, Plaintiff's redactions in the publicly filed documents have been so aggressive as to remove material not necessary to that purpose and which prevent a reasonable understanding of the issues presented.  Because Defendant's own public filings have placed her own medical records in the public domain, nothing is gained by sealing the documents.  The motions to seal are therefore denied, and the lodged unredacted motions, responses, and replies are considered by the Court in their place.  The Clerk of Court is directed to unseal those documents filed at docket entries 121–125, 130, 131, 138, and 150.

[2] Plaintiffs Motion for Leave (Doc. 148) is granted because Defendant's response to Plaintiff's motion for summary judgment contains what amounts to a cross-motion for summary judgment.  Doc. 144 at 2 ("The Court should deny summary judgment on Liberty's declaratory judgment claims and exercise its discretion to enter summary judgment against Liberty.")  Further in her Response, Defendant also included a Separate Statement of Facts.  (Doc. 143).  In its discretion, therefore, the Court allows Plaintiff the additional pages necessary to respond to the Defendant's Separate Statement of Facts to the extent that such facts may be referenced in support of Defendant's suggestion that the Court grant her summary judgment.

1    disability income policy, had not received disability benefits in the last five years, and were

2    actively working in their occupation.  (Doc. 25 at 17.)

3         Defendant decided to purchase a policy and submitted a "Lloyds of London, Multi-

4    Life Disability Income Insurance Enrollment Form." In the enrollment form dated May 19,

5    2014, Defendant identified herself as an insurance agent and affirmed that she had "been

6    continuously at work on a full-time basis in the usual and customary manner performing

7    all the duties" of her application.  (Doc. 1 at 6; Doc. 5 at 6.)  She further affirmed that "for

8    the 180 days prior to the date of the application she had not been homebound or hospitalized

9    due to an accident or sickness."  Apparently no other medical or financial underwriting was

10   done (Doc. 145-1 at 19.)

11        Though apparently not disabling, Defendant received treatments for pain in her neck

12   as early as 2010 when she testified to having Kenalog trigger point shots to treat such pain.

13   (Doc. 122 at 8.)  In the years between 2010 and 2017, Defendant saw a chiropractor and

14   had various injections for the problem.  On May 30, 2017, Defendant had a fusion/bone

15   graft at C4-5.  (Doc. 145-1 at 23, 27.)  Her surgeon was Dr. John Ehteshami.  She did not

16   achieve the relief from surgery for which she had hoped.  She was advised that she should

17   not work and that her ability to return to full-time work would be assessed throughout the

18   next year of her recovery.

19        Being unable to work sufficiently to maintain her agency, Defendant's affiliation

20   with Farm Bureau ended on January 3, 2018.  (Doc. 143 at 12.)  On January 10, 2018, a

21   request to cancel the policy was forwarded to Hanleigh Management, Inc. ("Hanleigh").

22   (Doc. 143 at 2.)   Hanleigh was a "Coverholder" and Plaintiff's agent.   Thereafter,

23   Defendant exercised the policy's portability option.  On March 31, 2018, Hanleigh issued

24   a Cancellation Rider that stated, "[t]he above numbered policy has been canceled as of

25   March 31, 2018[,] as per the Insured's request.  All terms and conditions therein are null

26   and void."  (Doc. 143-3 at 18.)  The "above numbered policy" was No. RCA43714038-

27   044.  (*Id.*)  Plaintiff then reassigned Defendant's policy and issued a new policy number,

28   No. RCA43714038026.  (Doc. 143-3 at 15.)

As it pertained to her ability to go back to work full-time, at a follow-up appointment with Dr. Ehteshami on April 18, 2018, the surgeon noted in his office record that "I have indicated to her that these limitations are realistic given how long she is out from surgery. It might be permanent and we would have to live with these limitations." (Doc. 143-1 at 31.)   A month later, on the anniversary of her surgery, she had another follow-up appointment with Dr. Ehteshami.  He noted in his record: "She is still debilitated from her condition.  She is not able to do the same activities as she was before . . . At this point, I expect that to be ongoing for her.'  (Doc. 143-1 at 32.)[3]

On this same date, Defendant submitted her notice of claim to Lloyd's—apparently the date the Policy's one-year elimination period had expired. The "new" policy number was listed on Defendant's Notice of Claim.  (Doc. 11-1 at 19.)  In response, she received proof of loss forms from Hanleigh—either on June 6, or July 18, 2018.  She provided a somewhat detailed Proof of Loss in late July, in which she detailed that she suffered from C1-C6 Advanced Disc Disease, C4-C5 Fusion/Bone Graft, and "Hypertension Stage 2-almost 3." (*Id.*)  Defendant listed these conditions as having been treated around October 2013, May 2017, and April 2018, respectively.  (*Id*.)  She also reported that her pain worsened in May 2013, and around that time, she consulted a chiropractor but did not begin pain management.  (*Id*.)  She further reported that she became totally disabled around May 2017 and, although she attempted to work on a part-time basis, she was not able to sustain this workload.  (*Id*.)  Her attending physician said Defendant's diagnosis was "cervical disc displacement" and "radiculopathy."  (*Id*. at 21.) Dr. Ehteshami completed and faxed the Attending Physician Statement ("APS") directly to Hanleigh on July 30, 2018 (Doc 143 at 9.)   This information included Dr. Ehteshami's assessment that she was continually totally disabled from the date of her surgery through September 30, 2018, when her disability would be re-evaluated.  (Doc. 143-1 at 9.)  Steigleman sent more information in support of her loss on September 5, 2018 (Doc. 143 at 9–11). On September 10, 2018,

---

[3] He did, however, set another appointment for six months out apparently to make another reassessment.  At his deposition in this matter, however, he confirmed that she was fully disabled.

Hanleigh contacted Defendant to obtain more information about her claim.  After receiving this information, Hanleigh recommended that Liberty rescind the Certificate's coverage because Defendant made misrepresentations in her portability enrollment form.

After a claims specialist affirmed this determination, Hanleigh contacted Defendant, stating that Lloyd's Underwriters had retained counsel.  This counsel informed Defendant of Liberty's coverage determination, explaining that her claim was not covered because "the alleged permanent total disability did not commence within 365 days of a covered sickness or any injury beginning within 365 days of a covered accident; Defendant's condition did not meet the definitions of a covered accident or sickness for which coverage is provided; the alleged condition was a pre-existing condition; and, that Liberty was rescinding the Policy due to Defendant's fraudulent misrepresentations in her portability option."  (Doc. 121 at 5.) He then purported to refund the premium paid for the policy extension.

Liberty then brought this lawsuit requesting a judicial determination that, given the terms of the policy, there was no coverage for Defendant Steigleman.  Defendant Counterclaimed not only for coverage but for bad faith and punitive damages.  Liberty now moves for summary judgment, but explicitly excludes reliance on pre-existing condition for doing so.

## DISCUSSION

### A.  Legal Standard

A court must grant summary judgment if there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  On a motion for summary judgment, the movant bears the burden of establishing the absence of genuine issues of material fact.  *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).  "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential

element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the movant "carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.*

There is no issue for trial unless sufficient evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id*. at 249-50. Nevertheless, the non-movant's evidence is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Ultimately, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

## B. Analysis

Under the Certificate's terms, Lloyd's would "pay the Permanent Total Disability Benefit shown on the Schedule for a periodic loss of income" if the following conditions were met:

> 1. The Insured becomes Permanently and Totally Disabled as defined below as a direct result of:
>
> (a) an Injury which occurs while this benefit is in force and causes Permanent Total Disability due to the Injury to begin within 365 days of a covered Accident; or
>
> (b) a Sickness which manifests itself while this benefit is in force and causes Permanent Total Disability to commence within 365 days of a covered Sickness; and
>
> 2. The Insured satisfies the Elimination Period shown on the Schedule; and

1

2

> 3. The Insured is under the regular care of a Physician that is appropriate for the condition causing the disability.

3

4

(Doc. 11-1 at 13.)  The Certificate defined "Permanently and Totally Disabled" as:

5

6

7

8

> Permanently and Totally Disabled means, as a result of a covered Injury or Sickness, the Insured is totally unable to perform the substantial and material duties of his or her regular occupation as shown on the Schedule for the entire Elimination Period and is not expected to recover for the remainder of his or her life. The Insured must also be under the regular care of a physician that is appropriate for the condition causing the disability.

9

(*Id.*)

10

11   Both parties agree that in Arizona "insurance policy interpretation is a question of

12   law." (Doc. 121 at 9; Doc. 144 at 5).  Arizona courts interpret policies according to their

13   plain language.  *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 199 Ariz. 43, 47, 13 P.3d 785,

14   789 (Ariz. Ct. App. 1984).  Where the provisions of the contract are plain and unambiguous

15   upon their face, they must be applied as written.  The Court enforces the ordinary meaning

16   of terms.  *Associated Indem. Corp. v. Harford Cas. Ins. Co.,* 2009 WL 3722999 at *2 (D.

17   Ariz. Nov. 4, 2009)  Where possible, Arizona courts interpreting the language of contracts

18   give effect to every provision.  *Christi's Cabaret of Glendale, LLC v. United Nat'l Ins. Co.,*

19   562 F. Supp. 3d 106, 116 n.1 (D. Ariz. 2021).  Further, they "look to legislative goals,

20   social policy, and the transaction as a whole."  *First Am. Title Ins. Co. v. Action*

21   *Acquisitions, LLC*, 218 Ariz. 394, 397, 187 P.3d 1107, 1110 (Ariz. 2008).

22   **1. The Alleged Sickness Causing the Disability Manifest Itself While the**

23      **Certificate Was in Force**

24   The Coverage Certificate requires that the "[d]isability due to Sickness must result

25   from a Sickness that manifests itself while the Certificate is in force."  (Doc. 1-1 at 3.)  In

26   this case the alleged sickness manifested itself while the Certificate was in force.  Even if

27   the sickness was manifest before the certificate was in force, "manifest" means "being

28   apparent" or "makes itself known."  The word "manifests" by itself does not mean only the

initial moment at which a condition becomes apparent.  In the context of this policy, a sickness manifests so long as it is apparent.  *Johnson v. Arizona Dept. of Econ. Security,* 247 Ariz. 351, 356, 448 P.3d 972, 977 (Ariz. Ct. App. 2019) (holding that when eligibility statute required a disability be "manifest before the age of eighteen" to be eligible for state benefits, the disease did not need to be diagnosed before that date, but only needed to be "apparent" before that date").  The case cited by Plaintiff to support the proposition that "manifests" actually means "first manifest" does nothing of the kind.  In *Jack v. Paul Revere Life Ins. Co.,* 97 Wash. App. 314, 982 P.2d 1228 (Wash. Ct. App. 1999), the policy language, as opposed to the language here, was "first manifests."  In that case, the policy specified that a disease that "first manifests itself after the date of issue," precluded coverage of a disease that was first manifest before that date.  The addition of the word "first" to the word "manifests" adds a separate meaning that is significantly different than the word "manifests" alone.  Even the dictionary definition offered by Plaintiff— "[c]apable of being readily and instantly perceived by the senses and esp. by the sight; not hidden or concealed; open to view," *Webster's Third New International Dictionary* 1375 (1981)—does not without additional words denote the first moment at which the sickness became obvious.  *See Keggi,* 13 P.3d at 789–90.  Otherwise, the limitation on pre-existing conditions to those conditions that prevent an insured from being actively at work in the first year they are insured would be meaningless.  Although no ambiguity is evident to the court, to the extent the word "manifests" in the policy could be ambiguous, it is, nevertheless construed against the insurer under Arizona law.  *First Am.*, 218 Ariz. at 397, 187 P.3d at 1110; *Coconino Cnty. v. Fund Administrators, Ass'n, Inc.*, 149 Ariz. 427, 431, 719 P.2d 693, 697 (Ariz. Ct. App. 1986).  Thus, there appears little dispute that Defendant's sickness was "manifest" while the certificate was in force.

### 2.  The Claim and the Proof of Loss Were Timely Filed

Even though "written notice of claim must be given within sixty (60) days after a covered loss occurs," (Doc. 1-1 at 11), a determination as to whether a loss is "covered" cannot be made until after the elimination period expires.  Elimination period, under the

policy is defined as the 12 months during which the Insured must be continuously disabled before benefits may be payable. (*Id.* at 5, 9.) And the definition of "Permanently and Totally Disabled" under the policy means that an insured is "unable to perform the substantial and material duties of [the insured's] regular occupation as shown on the Schedule for the entire Elimination Period and is not expected to recover for the remainder of his or her life." (*Id.* at 13.) Further, the benefit coverage insert specifies "No benefit will be paid prior to the completion of the Elimination Period." (*Id.*)

The Defendant in this case asserts that her total disability began in the late spring of 2017. A claim, then, does not become ripe until after the completion of the elimination period apparently used to establish the permanence of the disability. A notice of claim made prior to that time, while perhaps appropriate, does not change the meaning that an insured has until 60 days after the elimination period is complete to file a notice of claim on a "covered loss."

The policy further provides that once the insurer receives the notice of claim, "[w]e will send the Insured forms for filing proof of loss. (*Id.* at 11.) The policy then mandates that such "[w]ritten proof of loss must be given within ninety (90) days after such loss." (*Id.*) Hanleigh provided a proof of loss form either on June 6 or July 18. There appears to be no dispute that the proof of loss form is dated July 25, 2018, although the insurer alleges it did not receive it until September 5, 2018. There may be an issue of fact, therefore, regarding the timeliness of the submission of the proof of loss form, but, even if there was not, and the facts were established in Liberty's favor, Liberty provides the Court with an insufficient basis on which to suggest this late submission would be a basis on which it could deny all coverage to Defendant. Although no ambiguity is evident to the court, to the extent the term "covered loss" in the policy could be ambiguous, it is, nevertheless construed against the insurer under Arizona law. *First Am. Title Ins. Co.*, 218 Ariz. at 397, 187 P.3d at 1110; *Coconino Cnty.*, 149 Ariz. at 431, 719 P.2d at 697.

**3. The Alleged Total Disability Began Within 365 days of a covered Sickness**

The policy further mandates that any sickness which manifests while this benefit is

in force must cause "Permanent Total Disability to commence within 365 days of a covered Sickness." (*Id.* at 3, 13.)  The policy defines sickness as "any sickness, illness or disease that: (1)(a) is diagnosed or treated by a Physician while this Certificate is in force; and (b) is not a Pre-existing Condition" as defined by the policy.  (*Id.* at 9.)  And, as is demonstrated by the language above, a sickness "manifests" itself when it is obvious and, per the policy definition, is treated by a Physician during the term of the policy.  There is no dispute that Defendant was treated by a physician for the Sickness on the date she received her surgery, shortly if not immediately after which her disability began.

Plaintiff has made it clear in its Reply that it does not allege that the sickness in this case constitutes a pre-existing condition.  Nevertheless, even were it to make a pre-existing sickness argument in the context of defining sickness under the policy, it would still not limit coverage.  The policy language limitation on pre-existing conditions is clear.  And providing any such argument would vitiate that language, as well as the "guaranteed issue" representations made at sale.  The policy also provides "[n]o claim for loss incurred after 1 year from the Effective Date will be reduced or denied because a Sickness or physical condition not excluded by name or specific description before the date of loss existed before the Effective Date." (*Id.* at 11.)  It further consistently limits pre-existing exclusions to those that were manifest 12 months before the policy's effective date.  "We will not pay benefits . . . for a disability that results from a Pre-existing Condition, if you have been actively at work for less than 12 consecutive months after the date your Disability Insurance . . . takes effect under this Certificate." (*Id.* at 9.)  This is also consistent with the policy's representation on page 1 that "[t]his Certificate does not provide benefits for a loss due to a Pre-Existing Condition as defined in the Certificate unless: (1) the loss begins more than 1 year after the Effective Date Shown in the Schedule." (*Id.* at 3.)

Even if none of these policy provisions applied, A.R.S. § 20-1346(A)(b) would apparently mandate the same result in this case.  "No claim for loss incurred or disability (as defined in the policy) commencing after two years from the date of issue of this policy shall be reduced or denied on the ground that a disease or physical condition not excluded

1   from coverage by name or specific description effective on the date of loss had existed

2   prior to the effect date of coverage of this policy."  The statute is phrased in term of a

3   disability commencing; not in terms of a sickness commencing that eventually becomes a

4   disability.  There is no argument that the disability manifest itself for purposes of this claim

5   in late May 2017.  There is nothing in the policy that states that the disability must become

6   a permanent and total disability within 365 days of its first manifestation as opposed to its

7   manifestation during coverage.  Otherwise, the disqualification for pre-existing conditions

8   that last for only one year would be meaningless.

9         **4.  Defendant's Coverage Claim Does Not Depend on Whether She Ported Her**

10            **Policy**

11        The Defendant bases her coverage claim on the fact that she had coverage in the

12   Spring of 2017.  As the policy itself states, the "occurrence" by which coverage is

13   determined is a sickness which manifests while coverage is in force that results in a

14   continuous disability within 365 days of its manifestation and that continues for the

15   12-month elimination period.

16        With the elimination period provisions in the policy, no "claims made" reading of

17   the policy is practically possible.  To be permanently and totally disabled according to the

18   terms of the policy requires Defendant to be unable to perform the substantial and material

19   duties of her regular occupation for "the entire elimination period."  Such requirements

20   would most often, if not always, result, as they did here, in the loss of Defendant's regular

21   occupation during the 12 month elimination period, due to an inability to perform the

22   functions of the job.  The policy specifies that the coverage ends on the date the insured

23   terminates employment.  It also requires that Defendant no longer be able to perform the

24   duties of her job for 12 months before her claim could be covered.  Thus, the policy would

25   provide no coverage in most instances if it were construed as a "claims made" policy.  The

26   only sensible reading of the policy is that the relevant occurrence necessary for coverage

27   is the manifestation of the sickness as defined by the policy and not when the claim is made

28   upon the termination of the elimination period. *First Am.*, 187 P.3d at 1110 (stating courts

look to "legislative goals, social policy, and the transaction as a whole" in interpreting policy). The original policy was a "guaranteed issue" policy. There appears to be no question that Defendant correctly answered the questions asked of her on the application for that policy. Accordingly, there can be no denial of coverage for her original policy based on Defendant's failure to disclose her past treatments for neck injury/disease when nothing on the policy application required her to do so and she correctly answered the questions asked.

Further, nothing in that policy requires that the Certificate still be in force when the claim was ultimately filed, which is necessarily after the exhaustion of the elimination period. In this respect, the policy is an "occurrence" rather than a "claims made" policy—with the relevant occurrence being the manifestation of sickness while the certificate is in force. For this reason, the Court does not evaluate the misrepresentations on the portability application as material to the coverage under the original policy, nor does it evaluate any claim for coverage under a ported policy, except as they may relate to Defendant's counterclaims.[4]

Thus, even assuming she did not successfully port her policy, Defendant has a claim to coverage if she can establish that she otherwise qualified with the coverage requirements for a sickness that resulted in her permanent and total disability as of the end of May 2017.

---

[4] Plaintiff claims that it validly rescinded Defendant's coverage after she made material misrepresentations on her Portability Enrollment Form. In part, Plaintiff's argument appears to flow from a distinct argument that Defendant's request to port her coverage, along with Plaintiff's subsequent approval of that request, did not merely continue her coverage under the original policy, but rather created an entirely new policy that supplanted the original one. Plaintiff maintains this position even though it has not introduced a copy of this "new" policy, and even though the policies apparently have identical terms. Further, the Portability Enrollment Form unambiguously states that Defendant was "eligible for *continuation* of [her] The Agents Association Employee's Disability coverage." (Doc. 11-1 at 32 (emphasis added).) Plaintiff chose to check the Form's first box, which expressly indicated her intent to "continue" her coverage. She declined to check the second box, presumably because she did not "wish[] to cancel [her] current disability coverage." (*Id.*) Nevertheless, Plaintiff subsequently issued the Cancellation Rider. This may present issues of fact, but it does not entitle Plaintiff to summary judgment on coverage issues.

- 12 -

**5.  There is Sufficient Evidence of Permanent Total Disability**

Generally speaking, medical opinions must be given by experts.  It is also true that experts, generally, must file reports indicating their opinions and conclusions as a part of discovery.  However, "a treating physician is . . . exempt from Rule 26(a)(2)(B)'s written report requirement to the extent that his opinions were formed during the course of treatment."  *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 826 (9th Cir. 2011).  To be sure, such treating physicians must still make disclosure pursuant to Rule 26(a)(2)(C).  *Merch. v. Corizon Health, Inc.*, 993 F.3d 733, 739–40 (9th Cir. 2021) ("Nonetheless, disclosures of non-retained, treating physicians must include '(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify.'") (citing Fed. R. Civ. P. 26(a)(2)(C)).

The deadline for expert witness disclosure in this case was April 29, 2022.  Because Defendant filed no expert report by Dr. Ehteshami, or any other of Defendant's health care providers, Plaintiff takes the position that neither Dr. Ehteshami nor any other of Defendant's health care providers can be used to establish that the Defendant meets the policy definition of totally disabled.  (*See also* Docs. 115, 116).

This argument lacks merit.  Plaintiff was told after her surgery that she was unable to work.  At Defendant's April 18, 2018 post-surgical check-up, Dr. Ehteshami noted in his office record that "I have indicated to [the patient] that these limitations are realistic given how long she is out from surgery.  It might be permanent and we would have to live with these limitations."  (Doc. 143-1 at 31.)  A month later, on the anniversary of her surgery, she had another follow-up appointment with Dr. Ehteshami.  He noted in his record: "She is still debilitated from her condition.  She is not able to do the same activities as she was before.  . . . At this point, I expect that to be ongoing for her."  (*Id.* at 32; Doc. 143-4 at 16.)  He did, however, set another appointment for six months out apparently to make a reassessment.  In the interim he filed an Attending Physician's Statement with Hanleigh in July 2018, in which Doctor Ehteshami identified that Defendant's disability

remained permanent and total, that it began on May 30, 2017, and that it would be re-evaluated on September 30, 2018.

After this litigation began, and in her MIDP response of June 15, 2020 Defendant disclosed 113 pages of Dr. Ehteshami's medical records, noted his qualifications and his treatment of Plaintiff and further noted that "he may have opinions that will be rendered concerning the nature and extent of Defendant's medical condition and disabilities." (Doc. 134-1 at 42.) Liberty thereafter subpoenaed from Dr. Ehteshami his file pertaining to Defendant's claim against another disability insurer and received that information in 2021. Plaintiff noticed Dr. Ehteshami's deposition on December 16, 2021—the day before the fact-discovery cut-off. The fact discovery cut-off was approximately four months prior to the expert witness cut-off. At his deposition, under questioning by Defendant's counsel, Dr. Ehteshami testified that Defendant is permanently and totally disabled. (Doc. 123 at 4.) The following day Defendant supplemented her MIDP discovery responses to include the disclosure that "Dr. Ehteshami was deposed on December 16, 2021, and testified regarding Ms. Steigleman's diagnoses, including the nature of Defendant's medical condition, his treatment of Ms. Steigleman, and his prognosis that she is totally and permanently disabled." (Doc. 134-1).

Although the disclosure was not as complete as it relates to her other health care providers, Steigleman did identify her treating physicians on her proof of loss to Lloyds through a treating physician chart. (Doc. 135-1 at 14.) In an MIDP disclosure on June 15, 2020 she set forth her other health care providers, including Christina D. Trujillo, Dr. Daniel Ryklin, Dr. Dax Trujillo and Dr. Kelly Guld. In that MIDP disclosure the Defendant disclosed that each treatment provider "is an expert in the particular field of medicine in which she [or he] practices and may have opinions that will be rendered concerning the nature and extent of defendant's medical condition and disabilities." (Doc. 135-1 at 27-28.) To be sure, in the absence of experts reports, any opinions disclosed by these physicians must be formed during their treatment of the Defendant. Yet, Defendant did disclose medical treatment records from these health care providers. (*Id.* at 29.) Matters disclosed

in those records may be admitted.  Further, Defendant has already testified at her deposition that Christian Trujillo, Dr. Ehteshami, and Dr. Guld told her, presumably during their treatment of her, that she should no longer be working due to her medical condition.  (Doc. 135-1 at 38–40).  Such disclosure is sufficient to indicate the opinions of an expert formed during their treatment of their patient.

At any rate, even improperly disclosed expert evidence, including that under Rule 26(a)(2)(C), is not excluded when non-disclosure was "substantially justified or harmless." *Merchant*, 993 F.3d at 740.  Given the above facts and/or assertions, and Liberty's disclosure of these very Physicians, Plaintiff has not set forth any reason to assume that the failure of Defendant's treating physicians to file a written report about her total permanent disability was not harmless.

Because, at this point, there appears to be sufficient and admissible evidence from which a reasonable juror might find that Defendant developed a permanent total disability within 365 days of the sickness that manifest, or the injury that occurred during the pendency of the policy,[5] Plaintiff's argument, and its motion to exclude such testimony (Docs. 115 and 116) is denied.

### 6. Testimony from Dr. Klein is Admissible

The question on which Dr. Klein has formed his expert opinion is whether the Defendant became permanently disabled.  He conducted an IME on the Defendant.  He considered all of the medical records provided by Defendant that she indicated in her discovery responses were relevant to her disability.  Defendant argues that Dr. Klein did not consider every condition that she now alleges contributes to her disability.  Whether Defendant will be able to argue that these conditions contribute to her disability remains to be determined by the Court.  But it does not appear that Defendant argues, or would be in

---

[5] For the above listed reasons, Plaintiff's Motions In limine to Exclude Expert Opinions of Defendant's Treating Providers (Doc. 115) and Dr. John R. Ehteshami (Doc. 116) are granted in part and denied in part.  While any opinions testified to must have been formed in the course of the health care provider's treatment of Defendant, opinions so formed are not excluded.

1   a position to argue, that her cervical disease and its treatment are not a significant cause of

2   her disability.  Therefore, despite any limitations which Defendant can establish which may

3   go to the weight of Dr. Klein's testimony, he will be allowed to testify as to whether any

4   cervical condition causes or contributes to her disability.

5           **7. There are Sufficient Issues of Fact to Support Defendant's Counterclaims**

6                   **for Bad Faith and Punitive Damages**

7           Defendant raised a counterclaim against Plaintiff, asserting that it violated Arizona's

8   policy of good faith and fair dealing.  "Under Arizona law, a plaintiff establishes bad faith

9   on the part of the insurance company by showing that the company: 1) denied the claim

10  without a reasonable basis for the denial, and 2) either knew or recklessly disregarded the

11  fact that it did not have a reasonable basis for denying the claim." *Milhone v. Allstate Ins.*

12  *Co.*, 289 F. Supp. 2d 1089, 1093–94 (D. Ariz. 2003).  In denying Defendant's claim,

13  Plaintiff's agent did so in part on the false assertion that the policy required the permanent

14  total disability to be "first manifest" during policy coverage.  Its argument that "manifests"

15  and "first manifests" always and inevitably mean the same thing is incorrect, as is

16  Plaintiff's misreading of the 365 days provision.  It may be true Plaintiff otherwise

17  misinterpreted its policy in good faith.  But, as is explained above, Plaintiff's insertion of

18  the word "first" into the policy changes the plain meaning of the policy, Plaintiff's meritless

19  arguments to the contrary notwithstanding.  And such a misstatement of the policy's

20  provisions in its denial of coverage to the Defendant, together with the insertion of the

21  word "first" in the policy where it did not exist, could provide a basis on which a reasonable

22  juror could conclude that the Plaintiff had acted in bad faith, and further acted egregiously

23  enough to provide a basis for punitive damages.  A correct interpretation of the policy

24  juxtaposed with some of Plaintiff's other actions in canceling and reissuing the policy, as

25  well as its assertions about the basis for denying coverage under the policy, may give rise

26  to other grounds on which a reasonable juror could determine that the requisites for bad

27  faith and punitive damages were met.

28          Further, Defendant has engaged an industry standards expert to support her bad

faith, and punitive damage claims based on aspects of the handling of her claim by Plaintiff. Plaintiff has moved to exclude this expert. (Doc. 117).  The Court grants that motion in part—that is the expert is not an expert on the law including the interpretation of the policy. To the extent her opinion that the Plaintiff did not reasonably handle Defendant's claim may be based on interpretations of the policy that have not otherwise been set forth by this Court, they will not be allowed.

Defendant has also moved to exclude Plaintiff's claim handling expert Mr. Benedict O'Neill.  Mr. O'Neill will be precluded from offering an interpretation of the terms of the policy, and to the extent that his opinion that Plaintiff reasonably handled Defendant's claim based on his interpretations of the policy that have been rejected by the Court, it will not be allowed.  Nor is the Court inclined to allow Mr. O'Neil to testify as to the reasonableness of alternative interpretations of the policy—as that would require expertise in the law.  The Court is willing to hear further on this issue from the parties before finally ruling.  Mr. O'Neill will nevertheless not be prevented from testifying as to reasonable claim handling in light of the facts presented to the Plaintiff, or from responding to the opinions of Ms. Fuller to the extent that her opinions or the parties motions to preclude each other's claims handling experts are otherwise denied.   It is up to the jury to determine the credibility of the expert's opinions as it pertains to Plaintiff's handling of Defendant's claim.

## CONCLUSION

Accordingly,

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Exceed Page Limitation for Reply in Support of Motion for Summary Judgment (Doc. 148) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Strike Liberty's New Exhibits and Portions of Its Reply in Support of Summary Judgment (Doc. 153) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment

(Doc. 112) is **DENIED**.

IT IS FURTHER ORDERED that Plaintiff's Motion to Exclude Mary Fuller (Doc. 117) is principally **DENIED** but is only conditionally **GRANTED IN PART.**

IT IS FURTHER ORDERED that Plaintiff's Motion in Limine to Exclude Expert Opinions of Defendant's Treating Providers (Doc. 115) and Motion in Limine to Exclude Expert Opinions of Dr. John R. Ehteshami (Doc. 116) are **DENIED**.

IT IS FURTHER ORDERED that Defendant's Motion to Exclude Expert John R. Klein, M.D. (Doc. 114) and Defendant's Motion in Limine to Exclude Plaintiff Liberty's Expert Witness Benedict O'Neill (Doc. 126) is/are principally **DENIED** but is/are **GRANTED IN PART**.

IT IS FURTHER ORDERED that Defendant's Motion to Strike the Declarations of Mr. Scott Lalonde and Mr. Michael Evans Filed in Support of Liberty's Motion for Summary Judgment (Doc. 142) is **DENIED**.

IT IS FURTHER ORDERED that Plaintiff's Motions to Seal (Docs. 118, 119, 120, 129, 132, 137, 149) are **DENIED**.

IT IS FURTHER ORDERED directing the Clerk of the Court to file the documents lodged at Docs. 121, 122, 123, 124, 125, 130, 133, 138 and 150 on the public docket.

Dated this 21st day of November, 2023.

G. Murray Snow

G. Murray Snow
Chief United States District Judge